973 So.2d 933 (2007)
Brian Wesley. SIGNAL, Individually and Carrie J. Signal, Individually and on Behalf of her Minor Children, Cecilia Smith and Bailey Smith, Plaintiff-Appellee,
v.
Edward Lee ANDERSON, Economy Premier Assurance Company and City of Shreveport, Defendant-Appellant.
No. 42,646-CA.
Court of Appeal of Louisiana, Second Circuit.
December 19, 2007.
*935 Cook, Yancey, King & Galloway, by Scott Louis Zimmer, Shreveport, for Appellant, Economy Premier Assurance Company.
Klotz, Simmons & Brainard, by Harry D. Simmons, Brandon Trey Morris, Shreveport, for Brian Wesley Signal, Carrie J. Signal, Cecilia Smith, and Bailey Smith; and Intervenor-Appellee, United Services Automobile Association.
The Malone Law Firm, L.L.C., by Dannye Wayne Malone, Shreveport, Mary Ellen Winchell, for Appellee/City of Shreveport.
Before STEWART, DREW and MOORE, JJ.
DREW, J.
In this auto accident case, the defendant insurer appeals a judgment granting a JNOV motion on the issue of damages. Plaintiffs have answered the appeal seeking an increase in the damages awarded by trial judge. We affirm.

FACTS
On the afternoon of October 15, 2004, Brian Signal was driving his four-door Ford pickup east on Jordan Street in Shreveport. His passengers were his wife, Carrie Signal, who was in the front seat, and Bailey Smith and Cecilia Smith, her two daughters from a prior marriage, who were sitting in the back seat. At the same time, a Hyundai car driven by Edward Anderson was proceeding southbound on Coty Street.[1]
As the Signal vehicle approached the intersection of Jordan and Coty, Brian slowed the truck down to drive around a barricade in the middle of the intersection. When he was about 5-10 feet from the intersection, Brian suddenly noticed the approach of Anderson's vehicle and that it did not appear that Anderson was going to stop.[2] Despite Brian's efforts to veer, Anderson's car hit the middle of the driver's side of the Signal truck in a T-type collision. The impact, which occurred in the southeast quadrant of the intersection, caused the Signal truck to be pushed onto its side and to roll against a telephone pole before ending up on all four wheels.
Brian, individually, and Carrie, individually and on behalf of her minor children, Cecilia and Bailey, filed suit against Anderson, Economy Premier Assurance Company, and the City of Shreveport. *936 United States Automobile Association, Brian Signal's insurer, intervened in the suit.
The claims were bifurcated, with the trial judge deciding the claim against Shreveport. The jury found that Edward Anderson was 100% liable for the accident and awarded the following damages:
 Brian received $5,389.36 for past medical expenses, and 83,000.00 for pain and suffering.
 Carrie received $4,335.33 for past medical expenses, and $3,000.00 for pain. and suffering.
 Cecilia received $1,024.80 for past medical expenses, and $1,000.00 for pain and suffering.
 Bailey received $963.72 for past medical expenses and $1,000.00 for pain and suffering.
None of the plaintiffs received damages for loss of consortium or for loss of enjoyment of life.
On October 6, the trial court rendered judgment in accordance with the verdict. The trial court also assessed $20,800.03 as damages to United States Automobile Association for its subrogation claim, and $1,000.00 to Brian Signal for the deductible on his policy.
Plaintiffs filed a motion for JNOV or, in the alternative, a motion for new trial, on the issue of damages. They also filed a motion for additur. The trial judge granted the motion for JNOV and increased the pain and suffering awards to $10,000.00 for Brian Signal, to $15,000.00 for Carrie Signal, to $2,500.00 for Cecilia Smith, and to $2,500.00 for Bailey Smith. The trial judge also awarded damages for additional claims made by each plaintiff:
 Brian received $2,500.00 for loss of consortium and $2,000.00 for loss of enjoyment of life.
 Carrie received $3,000.00 for loss of enjoyment of life and $2,500.00 for loss of consortium.
 Cecilia received $500.00 for loss of enjoyment of life and $500.00 for loss of service and society.
 Bailey received $500.00 for loss of enjoyment of life and $500.00 for loss of service and society.
The awards for past medical expenses were not adjusted.
Economy has appealed, raising two assignments of error. They first argue that the trial court erred when it declined to include a requested interrogatory on unavoidable accidents on the jury verdict form.[3] They next contend that the trial court erred in granting the JNOV motion. Plaintiffs have answered the appeal, arguing for increases in the amounts awarded to Brian for pain and suffering and to Carrie for pain and suffering and past medical expenses.

UNAVOIDABLE ACCIDENT INTERROGATORY
The doctrine of unavoidable or inevitable accident relieves a person of liability as long as the person invoking the doctrine shows that he was in no way to blame for the happening. Seals v. Morris, 410 So.2d 715 (La.1981); Davis v. Smith, 35,117 (La.App.2d Cir.10/2/01), 796 So.2d 765, writ denied, 2001-2887 (La.1/25/02), 807 So.2d 250. Quoting Blashfield, Automobile Law and Practices 101.13 (Rev.3d Ed.1979), the supreme court in Seals, supra, explained the doctrine:
As a corollary of the rule for determining legal responsibility for negligence, if a motorist or other traveler has exercised ordinary care as required by the *937 common law (or the highest degree of care as may be required), and has nevertheless been the occasion of inflicting injury on another, the accident is said to be inevitable, for which no liability attaches. Unavoidable accident is not an affirmative defense but merely negatives negligence.
Id., 410 So.2d at 719.
Economy contends that the accident was unavoidable because the stop sign facing southbound traffic on Coty at the intersection was down at the moment the accident occurred. Deborah Houston, who lived near the intersection at issue, insisted that the stop sign was down at the time of accident.[4] She testified that it had been down for several days before the accident, and that she had called the Department of Streets and Drainage to report the problem.[5] Houston said the sign was not put back up on the day of the accident.
Houston's testimony was contradicted by the testimony of several employees of Shreveport's Department of Traffic and Engineering. Lisa Jenkins stated that there was no record of a report of the downed street sign in the system used by Shreveport to register complaints and requests from citizens.[6] Mike Boswell is the supervisor of the sign crews and barricade crews. He stated that the sign crews try to drive down each neighborhood street at least once every two weeks looking for problems, and if the sign crew sees a downed stop, sign, they fix it immediately.[7] Boswell testified that the date of the accident was the first time that the city learned of the downed stop sign.
John Garrett was a traffic control technician in the Department of Traffic and Engineering. Part of his job is to inspect street barricades almost every day and look for anything in the area of the barricade that could affect public safety. Garrett set up a barricade at the intersection in June of 2004. He took a photo of the barricade on September 13, and the photo shows the stop sign in its proper position. Garrett inspected the barricade at 11:03 a.m. on October 15 and took a picture. He stated that the stop sign would have been in his field of vision when taking the photo, and if the stop sign had been down, he would have noted it in his daily report and called a sign truck. AfterGarrett received a call from the Shreveport Police Department at approximately 4:44 p.m. that the stop sign was down, he returned to the scene and secured the stop sign.[8]
There was no credible eyewitness testimony that the stop sign was down immediately prior to the accident.[9] Officer Terry Sanders, who investigated the accident, determined that there was a non-functioning traffic control device, i.e., the stop sign.[10] Although the stop sign was down after the *938 accident, it may have been knocked down from impact during the accident itself. Because Anderson did not testify, the factfinders did not have the benefit of hearing his explanation as to how the accident occurred.
Brian thought Anderson had been speeding. Officer Sanders estimated that Anderson had been driving carelessly because the severe damage to the Signal vehicle indicated that he was probably speeding. Nevertheless, Officer Sanders did not write any tickets for speeding or careless operation. Officer Sanders did not find any skid marks or any indication that Anderson had attempted, to stop before the collision. Kenneth Lerchie was driving behind the Signals at the time of the accident. Lerchie thought that Anderson was driving close to the speed limit.
The jury heard an instruction on the doctrine of unavoidable accident. Nevertheless, Economy was not entitled to an interrogatory on this doctrine, because Anderson did not testify as to why he was not responsible for the accident. Accordingly, the doctrine was not applicable in this case. We find no error in the trial court's refusal to include an interrogatory about the doctrine on the jury's verdict form.

JUDGMENT NOTWITHSTANDING THE VERDICT
The law on JNOV was discussed at length in Smith v. State, Dept. of Transp. & Development, XXXX-XXXX (La.3/11/05), 899 So.2d 516. The supreme court stated:
La.Code of Civil Procedure art. 1811 provides for the trial court's use of JNOV. A JNOV may be granted on the issue of damages or the issue of liability or it may be granted on both issues. Davis v. Wal-Mart Stores, Inc., 00-0445, p. 4 (La.11/28/00), 774 So.2d 84, 89. The grounds upon which the district court may grant a JNOV are not specified in Article 1811; however, this court has set forth the standard to be used in determining when a JNOV is proper as follows:
[A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Trunk v. Medical Center of Louisiana at New Orleans, 04-0181, pp. 4-5 (La.10/19/04), 885 So.2d 534, 537 (citing Joseph v. Broussard Rice Mill, Inc., 00-0628, pp. 4-5 (La.10/30/00), 772 So.2d 94, 99). The JNOV strict criteria [are] predicated on the rule that "when there is a jury, the jury is the trier of fact." Trunk at p. 5, 885 So.2d at 537.
When reviewing a district court's grant of a JNOV, an appellate court must initially determine whether the district judge erred in granting the JNOV by employing the above-mentioned criteria in the same manner as the district judge in deciding whether to grant the motion. *939 VaSalle v. Wal-Mart, Stores, Inc., 01-0462, p. 11-12 (La.11/28/01), 801 So.2d 331, 339. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact. Id. at p. 12, 801 So.2d at 339. If the answer is in the affirmative, then the appellate court must affirm the district court's grant of JNOV. Joseph at p. 5, 772 So.2d at 99. However, if the appellate court determines that reasonable minds could differ, then the district judge erred in granting the JNOV and the jury verdict should be reinstated. Id.

Smith, XXXX-XXXX at pp. 12-13, 899 So.2d at 524-5.
The supreme court has further explained that once the trial judge has found JNOV is warranted regarding the amount of damages awarded, the trial judge must then make a de novo award of damages:
Once a trial court has concluded that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abusively low, it must then determine what is the proper amount of damages to be awarded. In making this determination, the judge is not constrained as the courts of appeal are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded that court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). . . .
The trial judge is in a better position to make a damage assessment than is an appellate court. The trial judge hears the testimony, views the evidence, and is able to evaluate the credibility of the witnesses. Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact. It should not be limited by the same constraints placed upon an appellate court reviewing a damage award. The trial judge should make an independent assessment of the damages and award a proper amount of compensation under the facts of the particular case.
Anderson v. New. Orleans Public Service, Inc., 583 So.2d 829,833-4 (La.1991).
If we determine that the JNOV was warranted, we must then review the amounts awarded by the trial judge for an abuse of discretion. Anderson, supra. Plaintiffs in this matter were awarded both general and special damages.
The trier of fact has much discretion when assessing damages in cases of offenses, quasi offenses, and quasi contracts. La. C.C. art. 2324.1. Before an appellate court may disturb an award for general damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied. The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages. Eddy v. Litton, 586 So.2d 670 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1203 (La.1992).
It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to, prior awards in similar cases is proper. Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether the award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by *940 the trier of fact. Likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Manuel v. State Farm Mut. Auto. Co., 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.

CARRIE SIGNAL'S DAMAGES
Pre-Accident Medical Condition
Because Economy argues that Carrie had preexisting medical conditions that involved her back, our review of her medical treatment necessarily begins prior to the accident. In 1999, Carrie was diagnosed with traverse myelitis. It was also believed that she had fibromyalgia. In January of 2001, neurologist Dr. Ben Nguyen thought the myelitis was probably causing hand numbness and paresthesia. A thoracic MRI performed on May 14, 2002, showed mild disc desiccation in the mid thoracic levels, but no disc herniation was found. Carrie went to the emergency room ("ER") on April 12, 2003, with complaints of mid thoracic pain and spasms. On July 23, 2003, Carrie called the medical clinic at Barksdale Air Force Base ("BAFB") to inquire about seeing a specialist to treat her severe back pain. She went to the ER later that day complaining of recurring back pain, with the pain now in her lower back and feeling the worst it had been.[11]
On July 28, 2003, Carrie was treated by a Physician Assistant ("PA") at BAFB. She reported severe back pain that measured between eight and nine on a ten-point scale, and the PA found palpable lumbar spasms at L4-5. When Carrie called BAFB on September 4, 2003, it was noted that she had chronic lower back pain and was scheduled to visit a pain clinic later that month.
Carrie's medical records reflect that in July of 2003, she received authorization to visit a pain management clinic for care of her chronic low back pain. Reports from BAFB dated October 9 and November 18, 2003, stated that Carrie had been treated at LSU's pain clinic for chronic low back pain and needed long term management. Carrie could not recall seeing anyone at the LSU pain clinic.[12]
Post Accident Medical Treatment
Carrie was transported by ambulance to the ER after the Friday accident. She complained of pain between her shoulder blades. The diagnosis upon discharge was thoracic back pain and musculoskeletal pain.[13] Carrie followed up with her doctor at BAFB the following Monday for treatment of shoulder stiffness and lower back soreness.
Dr. Thomas Johnson, a chiropractor, began treating Carrie on October 27, 2004.[14] His diagnosis was moderate whiplash, moderate sprain of the lumbar spine, moderate migraine headache, and moderate sprain of the thoracic spine. She rated her back pain at the time as an eight on a ten-point scale.
Dr. Johnson, who testified as an expert in chiropractic medicine, believed that Carrie reached maximum medical improvement *941 ("MMI") as of December 27, 2004. He explained that what he meant by MMI was more accurately described as maximum chiropractic improvement. He felt that he had gone as far with conservative therapy as he could, despite the fact that Carrie was still having low back paint[15] He thought she should see a specialist for treatment.
Palpation during the last visit showed mild tenderness in the cervical region and no tenderness in the lumbar region. Dr. Johnson's report from this last visit stated that her conditions had resolved. He explained that what he meant by resolved was that she did not have any apparent symptoms during that particular examination, when he thought she was having a good day. Dr. Johnson recognized that her condition may become better or could worsen during the course of a day.
Carrie was involved in another motor vehicle accident on January 31, 2005. Dr. Richard Kamm, a general medicine physician, examined Carrie on February 8, 2005. No soft tissue swelling or muscle spasm in the back was found by Dr. Kamm on palpation, but he did note there was increased muscle tension. Carrie had restricted ranges of motion in the back that were consistent with her reports of moderate tenderness in the cervical, thoracic, and lumbar regions of the back. His impressions were that she had headaches and bilateral musculoligamentous strains of the cervical, lumbar, and thoracic regions, and that the headaches and strains were related to the accident at issue and had been exacerbated by the 2005 accident. Dr. Kamm also noted that Carrie reported intermittent paresthesia in the right lower extremity and both upper extremities that had been present since the October 2004 accident. Dr. Kamm prescribed a muscle relaxant and anti-inflammatory drug, and he advised Carrie to limit her physical activities, apply cold to affected areas, and continue massage therapy.
When Carrie returned to Dr. Kamm on February 24, she told him that there had been no change in her back, but her headaches had become more frequent and, severe. Dr. Kamm noted that her ranges of motion were slightly better. His findings on palpation remained, the same. She re ported that she still had paresthesia in the upper extremities and right lower extremity, and that it sometimes extended to her left lower extremity. She also reported that she had stopped taking the antiinflammatory medicine and had stopped receiving massage therapy. The treatment plan was modified to discontinue the anti-inflammatory, adjust the dosage of the muscle relaxant, and add a headache medicine. Carrie was encouraged to be evaluated at the Center for Integrative Medicine ("CIM").[16]
Carrie was examined by Dr. Kamm again on March 24, 2005. Her complaints about her back remained the same. She said her headaches had worsened and had become more frequent. She reported having intermittent paresthesia in her all extremities.[17] Dr. Kamm found that her ranges of motion had significantly improved since her first visit, and there was no swelling, spasms, or increased tension in the back muscles upon palpation. It *942 was noted that Carrie had stopped seeing a chiropractor, had not started physical therapy, and had not gone to the CIM. She was also not using any medication.[18] Dr. Kamm thought that by objective measures her condition had improved and she was where he expected her to be without her following his treatment plan. At this examination, Carrie declined various therapeutic alternatives that were discussed with her, and she stated that she did not want to take medication.[19]
Dr. Kamm examined Carrie for the last time on May 11, 2005, when she told him that her physical condition remained unchanged except for some new complaints[20] He found that the ranges of motion in her back were normal again. Dr. Kamm's impression was that the back strains had objectively resolved. Carrie once again stated that she had decided not to use any medications or undergo the treatment options mentioned by Dr. Kamm,[21]
Dr. David Adams performed an electrodiagnostic examination of Carrie on August 1, 2005, and the findings were negative,[22] When Carrie was treated at BAFB on September 19, 2005, she reported having headaches as well as pain in the cervical and lumbar spine that radiated into her extremities.
On November 3, 2005, Carrie underwent a lumbar spine MRI, which the radiologist thought revealed a very mild broad-based disc bulge at L3-4, and a broad-based disc bulge at L4-5. There was mild disc dessication without significant disc bulge at L5-S1. The radiologist remarked that there was no significant spinal canal narrowing or neural foraminal narrowing at any level.
Dr. Marco Ramos, a neurosurgeon, first met with Carrie on December 1, 2005. In her history, she reported that after the October accident, she experienced progressive onset of low back pain that radiated to the posterior aspect of both lower extremities. The November MRI was not available for review at this examination. Dr. Ramos did not think that Carrie had symptoms of fibromyalgia or traverse myelitis at the time. Based upon his neurological exam (which showed a limited range of motion, loss of sensation, and weakness of the dorsiflexor of the foot) and Carrie's history, Dr. Ramos believed that she had a disc problem at L4-5.
Dr. Ramos's notes from his December 20, 2005, examination of Carrie reflect that she continued to complain of persistent low back pain that radiated to the posterior aspect of both lower extremities. Acknowledging that the radiologist thought Carrie's lumbar MRI was normal, Dr. Ramos noted that the MRI showed a herniated nucleus pulposus at L4-5 and to a lesser degree at L5-S1. Dr. Ramos recommended surgery, but also told Carrie that an alternative was to continue the conservative route of physical therapy and pain management, *943 but she said that had not helped.[23]
On January 4, 2006, Dr, Ramos performed a hemi-laminectomy at L4-5 and L5-S1 bilaterally, and a microdiskectomy at L4-5 and L5-S1 on the right side. He also explored the L5-S1 and L4-5 discs on the left side. Dr. Ramos thought the surgery confirmed his interpretation of the MRI as showing herniated discs. Dr. Ramos stated that he did not find any evidence of any degenerative process, nor had he seen any when he had looked at the MRI.
Dr. Ramos thought the surgery was successful. The records show that her recovery was uneventful for the most part. Several days after the surgery, she reported to a PA at BAFB that she had a rash over her entire body and was in severe pain. The next month, she told Dr. Ramos that she was experiencing muscle spasms. In April, Carrie complained to Dr. Ramos that she felt worse than before `the surgery because of muscle spasms, leg pain, and symptoms radiating to her right back. However, the next month, she reported to Dr. Ramos that she was doing well other than having occasional aching in the low back. In July of 2006, Carrie told Dr. Ramos that she had pain across the lower back and into the hip, but it was not radiating to the lower extremities as it had prior to surgery.
Dr. Ramos's prognosis was that Carrie may have discomfort in the lower back, but eventually the symptoms should subside. He thought her work activities would prolong her recovery, and that she might need some physical therapy, muscle relaxants, and analgesics.
Opinions About Carrie's Condition
Dr. Carl Goodman, an Orthopedic Spine Surgeon, examined Carrie's medical records on behalf of Economy.[24] Dr. Goodman believed that Carrie only sustained cervical and lumbar strains and sprains in the October 2004 accident. Reviewing the lumbar MRI from November of 2005, Dr. Goodman found evidence of degenerative disc changes at L4 and L5 with mild midline disc bulges at those levels, and mild spinal stenosis at L4-5. He did not see any soft disc herniation, so he thought it was more probable than not that Carrie did not develop significant disc herniation because of the accident.
Testifying as an expert in the field of orthopedic spine surgery, Dr. Goodman explained that by degenerative disc changes, he meant the discs had lost some water as part of the natural aging process.[25] The loss of water can lead to a bulging disc. Degeneration of a disc can cause back pain, and if it pinches a nerve, leg pain.[26] Dr. Goodman noted that prior to the 2004 accident, Carrie had been referred to pain management, which is reserved for those suffering from chronic pain, for her low back pain.
It was felt by Dr. Goodman that Dr. Ramos's surgery was to treat a chronic condition, and that the lumbar degenerative disc changes, bulges, and mild stenosis were present prior to that accident.[27] Dr. Goodman believed that it was more probable than not that Carrie was having symptoms *944 caused by this degenerative condition prior to the 2004 accident. He pointed to her pre-accident complaints of lower back pain as indications of the degenerative disc changes becoming symptomatic.
Dr. Goodman observed that with medication, and perhaps physical therapy and activity modification, Carrie should have recovered in three to six months. He added that even without any treatment or therapy, a person with cervical and lumbar strain and sprain will usually get well anyway. He did not consider Carrie's condition as one requiring surgical intervention.
Dr. Ramos testified as an expert neurosurgeon. He opined that it was more likely than not that the herniated discs at L4-5 and L5-S1 were caused by the trauma of the 2004 auto accident.[28] He also thought that her condition progressively worsened after this October 15 accident until she came to see him. It did not change his opinion that Carrie was involved in another accident three months later because Carrie told him that her symptoms began after the 2004 accident and then progressed.
Dr. Ramos disagreed with Dr. Goodman that the MR. reflected degenerative changes. Moreover, the disc conditions encountered by Dr. Ramos during the surgery were not degenerative. In reference to the disc dessication shown in the 2002 thoracic spine MRI, Dr. Ramos stated that a single disc showing dessication does not indicate that the patient has degenerative changes, because while dessication is a component of degeneration, on its own it is not diagnostic of degenerative changes. He also added that disc dessication on its own cannot cause a disc to bulge or become herniated.[29]
Dr. Kamm testified that when he first treated Carrie, he thought her condition was trivial and that she would mostly recover in about six weeks if she followed the treatment course. He did not think she would have the complaints that she presented with on March 24, 2005, but he was not surprised in light of her failure to take medications or follow any of the treatment alternatives suggested to her.[30] Based upon his objective findings, he certainly did not expect her to have a bulging or herniated disc. Dr. Kamm believed that her soft muscle injuries were caused by the October 2004 accident and exacerbated by the second accident.
Dr. Kamm did not recall Carrie ever mentioning the 2003 ER visits or her referral to the pain management clinic because of chronic back pain. He did not think the ER visits were significant, but he thought the referral to the pain management clinic was important for him to know so the treatments would not conflict.
Dr. Kamm testified that he would defer to Dr. Ramos's conclusions regarding the MRI, the relation between the 2004 accident and the herniated disc, and the need for surgery. Dr. Kamm added that the medications and therapy alternatives would not have made much difference with her condition if she had a herniated disc.
Carrie testified that she began experiencing back pain a week or two after the 2004 accident, and it became progressively *945 worse until she went to Dr. Ramos. She felt that Dr. Johnson's treatment did not provide permanent relief, and her symptoms did not improve while under Dr. Kamm's care. Carrie would not attribute any increased aches and pains or new complaints to the accident in January of 2005, but thought the second accident possibly made the pain she experienced in the morning feel a little worse.
Carrie contended that while she had back pain before the 2004 accident, it was experienced prior to July of 2003, and it was a different pain and involved muscle spasms different than what she experienced after the accident. She attributed the earlier pain to her myelitis and fibromyalgia. Dr. Goodman agreed that fibromyalgia can cause back pain.
Carrie asserted that she was asymptomatic at the time of the 2004 accident. She asserted that her last big flare-up was in July of 2003. Dr. Kamm never found evidence of fibromyalgia or myelitis during his examination.
Carrie's myelitis apparently was not a significant consideration when determining exactly what injuries were sustained by Carrie in the accident at issue. Dr. Ramos explained that traverse myelitis affects the muscles and spinal cord, which stops at about level L2 of the spine. Carrie's myelitis was in the area of her cervical spine. Dr. Goodman was not considering the myelitis when he referred to Carrie's chronic lumbar condition. In fact, Dr. Goodman stated that he did not want to answer questions about myelitis because he did not know anything about that condition.
Carrie considered the surgery to have been successful, and she thought that she had mostly recovered. She still had some pain, but she believed that could be attributed to her activity level and general healing time. She developed a rash after surgexy, and the rash left little "stains" all over her body, with "stains" on her torso the worst.
Carrie worked as a physical therapy assistant at the time of trial. At the time of the accident, she was pursuing a degree as a Physical Therapy Assistant. She began her rotations in November of 2004 and finished the program on time in August of 2005. She formed her own rehabilitation company the following December.
Carrie stated that between the accident and her surgery, her housework, cooking, and personal responsibilities were affected as she was limited in any activity that involved bending, standing for a long time or sudden movement. She was rarely able to do housecleaning, so Brian had to do more of it when he could. She and Brian had not been married for a long time when the accident occurred, so it affected their intimacy. Brian stated that they were unable to use their party barge in 2005 as much as they normally would. Prior to the accident, they had used it three to four times per month, but they used it only three or four times during the entire summer of 2005.
JNOV
The jury awarded Carrie only $4,335.33 in past medical expenses even though she sought over $36,000.00 in such expenses. In doing so, the jury essentially found that an electrodiagnostic exam in August of 2005, the 2005 MRI, Dr. Ramos's examination, and the surgery were not related to the injuries she sustained in the 2004 accident, but were related to a preexisting disc condition.
Based on this record, reasonable men could not differ that the amounts awarded for pain and suffering ($3,000.00), loss of consortium ($0), and loss of enjoyment of life ($0) were abusively low for the soft tissue injuries sustained by Carrie. Accordingly, *946 the trial judge properly granted the JNOV. We also find that the trial judge did not abuse her broad discretion when awarding $15,000 for pain and suffering, $3,000 for loss of enjoyment, and $2,500 for loss of consortium to Carrie. We likewise find no abuse in the jury's discretion to limit the award of past medical expenses to $4,335.33.

BRIAN SIGNAL'S DAMAGES
Brian was transported to the ER at Schumpert by ambulance, where he was treated for complaints of neck pain. When he was treated by a PA at BAFB on October 18, 2004, Brian reported that his neck and back were hurting and tight. Brian was treated by Dr. Thomas Johnson on October 25, 2004. Dr. Johnson diagnosed moderate whiplash, moderate sprain in the lumbar spine, moderate headache, and moderate restriction of motion in the thoracic spine.[31] Dr. Johnson thought these injuries had been caused by the accident. After Brian underwent conservative chiropractic physical therapy and spinal correction, Dr. Johnson reported that Brian had reached MMI as of December 27, 2004.
Brian was again treated by the PA on January 7, 2005. His diagnosis was cervicalgia and lower back pain, and he prescribed physical therapy, which Brian began at BAFB on January 21, 2005. He complained at therapy of low back and neck pain, and he said that he had experienced little improvement while being treated by Dr. Johnson. By March 15, 2005, Brian reported that he had considerable improvement in his cervical spine, and his lower back pain had decreased to only intermittent pain. The therapist noted that Brian had made excellent improvement.
Brian testified that he thought of himself as being 90-95% back to normal in March of 2005, and was 95% back to normal at the time of trial. He began lifting weights and running again in June of 2005.
Brian contended that their sex life was affected by the accident because they were unable to have sex owing to her back pain after the accident. Carrie stated that Brian was not able to do as much repair work or yard work around the house because he was sore and stiff for quite a while.
We do not find that the trial judge was unwarranted in granting the JNOV, nor do we find that she abused her discretion in the amounts she awarded to Brian for pain and suffering, loss of consortium, and loss of enjoyment of life.
CECILIA, AND BAILEY'S DAMAGES
Cecilia was eight years old and Bailey was five years old at the time of the accident. Brian testified that the girls were screaming immediately after the accident, and their faces had been cut from glass. He didn't think Bailey had as many facial cuts as her sister. Carrie testified that the girls had minor scrapes from the broken glass and were emotionally upset. Both were transported by ambulance to the ER.
Bailey was first treated by Dr. Thomas Johnson on October 27, 2004. His diagnosis was mild to moderate sprain of the thoracic spine, and moderate restriction of motion in the cervical spine. He thought she had reached MMI as of November 24, 2004.
Cecilia was diagnosed with a head contusion at the ER. Dr. Johnson began treating *947 Cecilia on November 1, 2004. His diagnosis was moderate migraine headaches. He thought she had reached "MMI as of November 24, 2004.
Carrie thought both girls stopped complaining about physical pain about two weeks after the accident. However, the girls still become upset if their car stops suddenly or they hear a tire squeal. Brian did not think that either girl had any permanent scars, and he thought it was over a month before Cecilia was okay.
Based upon our review of this record, we find that the trial court was warranted in granting the JNOV after the jury awarded only $1,000.00 each to Bailey and Cecilia for pain and suffering, and made no award for loss of enjoyment of life and loss of service and society. We discern no abuse of discretion in the amounts the trial judge awarded to the two young girls.

CONCLUSION
For the foregoing reasons, the judgment is AFFIRMED at the costs of Economy Premier Assurance Company.
NOTES
[1] The vehicle was owned by Hugh Rinkle and insured by Economy Premier Assurance Company.
[2] Brian Signal agreed that a tree partially obstructed his view of southbound traffic on Coty, and thought the same was true for a southbound driver on Coty.
[3] The proposed interrogatory read, "Do you find by `a preponderance of the evidence that this accident was unavoidable, and therefore no one was negligent?"
[4] By "down," Houston meant that the sign was leaning and almost touching the ground with the word "Stop" face down.
[5] Houston testified in her deposition that she first noticed in September that the sign was down.
[6] Jenkins stated that the system would sometimes not show a complaint about a stop sign because that is the sort of problem that would be taken care of immediately.
[7] Boswell noted that his department sometimes receives calls from the Department of Streets and Drainage about downed stop signs.
[8] The responding police officers had already placed the sign upright in its hole.
[9] The trial judge, who decided on the City's liability in this bifurcated trial, clearly stated that Houston was not a credible witness.
[10] Officer Sanders did not recall seeing the stop sign down when he had patrolled the area prior to the accident.
[11] She told the treating doctor that the pain was usually in her mid to upper back.
[12] Carrie testified that she was referred to pain management at LSU, but she could not go because one of her daughters had an appointment at the same time, and she could not reschedule for a time that her insurer thought was appropriate.
[13] X-ray of the thoracic spine showed no evidence of any acute traumatic abnormality.
[14] X-rays of the cervical and lumbar spine showed no fractures, soft tissue pathology, or osseous pathology.
[15] By then, she was rating the pain as a two on a ten-point scale.
[16] Dr. Kamm recalled that Carrie explained that she had gone for a physical therapy evaluation and it had been recommended that she go to the Center for Integrative Medicine.
[17] Carrie also stated that she had muscle weakness in her right upper extremity and muscle spasms in her right hand.
[18] Carrie testified that Dr. Kamm had referred her to physical therapy at the Spine Institute, but the physical therapist there decided not to perform therapy on her.
[19] It was noted that Carrie was waiting to be evaluated by a neurologist in Biloxi, Mississippi.
[20] Her new complaints were of bilateral knee pain, and fainting and dizzy spells caused by the headaches.
[21] Carrie told Dr. Kamm that she was waiting to be evaluated by Dr. Stephen Jaffe, a neurologist at the LSUHSC Neurology Clinic. Dr. Jaffe examined her on May 27, 2005. His impression was posttraumatic headache associated with a closed head injury and persistent cervical myofascial discomfort.
[22] There was no evidence of ulnar neuropathy or carpal tunnel syndrome in either upper extremity, and no evidence of myopathy, neuropathy, or radiculopathy in any extremity.
[23] Dr. Ramos was unaware that Carrie had not undergone physical therapy as suggested by Dr. Kamm.
[24] He never examined Carrie.
[25] Dr. Goodman stated that the loss of water would make a disc appear darker on an MRI.
[26] Spinal stenosis is a degenerative condition that can also cause back and leg pain.
[27] The 2002 thoracic spine MRI had shown degenerative disc change in the mid thoracic spine.
[28] There was some agreement between Drs. Goodman and Ramos that a bulging disc is also a herniated disc, although Dr. Goodman considered a bulge to be a minor disc herniation.
[29] Dr. Ramos agreed that the ligamentum flavum hypertrophy shown on the November 2005 lumbar MRI is another component of degenerative changes.
[30] Dr. Kamm thought Carrie would recover in about six months if she did not follow any treatment plan.
[31] Cervical and lumbar x-rays showed no apparent fractures or soft tissue or osseous pa thology.